**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Larry E. JENNINGS, Sr., Defendant–Appellant.**

**No. 96–4170.**

United States Court of Appeals,
Fourth Circuit.

Argued July 11, 1997.

Decided Nov. 19, 1998.

George J. Terwilliger, III, McGuire, Woods, Battle & Boothe, L.L.P., Washington, DC, for Appellant. Kathleen O'Connell Gavin, Assistant United States Attorney, Baltimore, Maryland, for Appellee. Laura A. Colombell, McGuire, Woods, Battle & Boothe, L.L.P., Washington, DC; E. Duncan Getchell, Jr., Richmond, Virginia, for Appellant. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

## OPINION

MICHAEL, Circuit Judge:

A jury found Larry Jennings, Sr., a housing repair contractor, guilty of three counts of violating 18 U.S.C. § 666, a statute that prohibits corruption of officials who administer state and local programs receiving federal funds. On appeal Jennings argues that § 666 outlaws only bribes, not gratuities, and that the government did not prove that the payments he made to a city official were

actually bribes. We conclude, however, that the evidence was sufficient to convict Jennings of bribery. Jennings also contends that a new trial is required because the jury instructions misstated the "corrupt intent" element of bribery by failing to require proof of intent to engage in a quid pro quo. We reject this contention under a plain error analysis. Accordingly, we affirm.

### I.

The Housing Authority of Baltimore City (HABC) is a local government agency that operates and maintains subsidized housing units within the City. HABC receives funds from the United States Department of Housing and Urban Development. In late 1991 HABC began a special program to renovate hundreds of vacant housing units owned by that agency in Baltimore. To expedite the renovations, a housing emergency was declared, which allowed HABC to dispense with the usual bidding procedures for selecting contractors. As a result, HABC developed a list of about thirty contractors who were awarded work by purchase order without competitive bidding. This no-bid program was known as the Vacancy Special Funding Program (VSFP). Between 1992 and 1994 Charles Morris, a HABC employee, was the administrator of VSFP. Morris had the discretion to decide what jobs were awarded to each contractor on the list as well as the authority to negotiate the price for each contract.[1]

Under the VSFP program, contractors submitted an estimate of the cost to rehabilitate a housing unit, and an in-house estimator at HABC prepared a second, independent estimate. Morris sometimes did the in-house estimate himself. Morris reviewed the two estimates in every case. If the contractor's estimate and the in-house estimate differed by less than ten percent, Morris forwarded the paperwork for formal approval and the issuance of a purchase order. If the estimates differed by more than ten percent, Morris either increased the in-house estimate or negotiated a reduction in the contractor's

---

1. Morris, who was the government's main witness, testified pursuant to a plea agreement. Morris pled guilty to a violation of 18 U.S.C. § 666 for accepting money from Jennings and several other contractors doing VSFP work.

estimate. Upon the issuance of the purchase order, the contractor was authorized to begin work. When the job was finished, a HABC inspector working under Morris inspected the unit. If the inspector found that the work had been performed satisfactorily, the inspector issued a certificate of completion to the contractor. The contractor then submitted the certificate to Morris for payment.

Jennings was a construction contractor who owned two businesses, Elias Contracting Co. (Elias) and Environmental Protection Co. (EPC). He was vice-president of both companies and his daughter, Georgia Jennings Page (Page), was president. In 1991 Jennings became interested in obtaining HABC contracts for Elias. He and his son, Larry Jennings, Jr. (Jennings Jr.), met with Morris at a restaurant that year to discuss the possibility of doing VSFP work. Jennings Jr. was a member of the HABC Board of Commissioners, which oversaw HABC's activities. Sometime after this meeting Morris placed Elias on the VSFP contractor list.

While Elias was performing VSFP work in 1993, Jennings made cash payments to Morris on five occasions. The first payment occurred in early spring when Morris went to Jennings's office to deliver a HABC check for work that Elias had completed. There, Jennings gave $200 to Morris and told Morris that he (Jennings) would not "have made it" without Morris's help. After this payment, VSFP contracts and payment checks flowed on a regular basis from HABC to Jennings's companies.

Later that spring, on April 26, 1993, Elias deposited in its account a $75,786.43 check from HABC for work performed under the VSFP program. That same day, Jennings telephoned Morris to arrange a meeting in Jennings's car. As the two men drove around downtown Baltimore, Jennings handed Morris a paper bag containing between $2,500 and $3,000 in cash. In thanking Morris, Jennings acknowledged that Morris's help had been essential. The following day Elias submitted five new proposals for VSFP work totaling $86,609. Over the next several days Morris reviewed these proposals and approved them at a total of $86,061, very close to the amount Elias had sought. To approve the jobs for that level of payment, Morris had to increase several of the in-house estimates.

On May 4, 1993, Elias deposited another HABC check in the amount of $46,408.75, received in payment for VSFP work. The next day Jennings again met with Morris. Jennings gave Morris $2,500 in cash and thanked him, just as before. Over the next week Elias submitted eight new proposals for VSFP work, with a total price tag of $170,440. Morris approved all of the proposals for a total price of $163,973. In authorizing this work, Morris bumped up some of the in-house estimates, approved several proposals for the exact amount Elias requested, and approved others for amounts slightly less than the Elias estimates.

In June 1993 Jennings's other company, EPC, began efforts to obtain work under another no-bid program at HABC, lead testing on VSFP units. Morris gave Page a sample proposal to use in preparing EPC's submission for this work. Soon thereafter, Page gave Morris a draft of EPC's $254,000 proposal, and Morris worked over a weekend to help Page finalize the proposal. At about the same time, Elias submitted eight new proposals, totaling $151,535, for VSFP rehabilitation work. On June 25, 1993, Morris approved all eight of these proposals for amounts near or equal to what Elias requested, for a total authorization of $148,841. That same day HABC issued a purchase order awarding the lead testing contract to EPC, and Elias deposited a HABC check for $16,506. Also on that day, Jennings gave Morris $1,500 in cash. Jennings told Morris, "If it wasn't for you, I don't know what I would have done." In July 1993 Jennings gave Morris an additional $200 in cash.

Jennings used various ploys to get the cash for the three payments charged in the indictment. For the first payment (of $2,500 to $3,000) Jennings, on April 26, 1993, wrote a $3,000 check on the Elias account, payable to Moe Construction, a small company that had subcontracted with Elias to rehabilitate two VSFP units. Jennings, however, did not deliver the check to Moe Construction. Rather, Jennings took the check to Charles "Moe" Armwood, who ran a check cashing and liquor store business called Doc's Li-

quors. Moe Armwood cashed the check for Jennings, endorsed it, and deposited it in the bank account of Moe Corporation II, one of Armwood's business accounts. That same day (April 26) Jennings took the cash proceeds from the check and made a payment to Morris.

Cash for the second payment, for $2,500, came from a $15,000 check, dated May 5, 1993, that Jennings wrote on the Elias account, payable to B.H.S., another Elias subcontractor. Jennings did not deliver the check to B.H.S. Once again, he took the check to Moe Armwood at Doc's Liquors, who cashed it. Jennings used part of the cash to pay Morris.

Money for the last charged payment came from a $1,500 personal check that Jennings cashed at Doc's Liquors on June 26, 1993. Jennings took the full $1,500 to Morris that day.

Although Morris admitted to accepting cash from Jennings, he testified that he took gifts, not bribes. Morris also said that while he often assisted Jennings's companies with paperwork, he never did any special favors for Jennings's companies as a result of the gifts. Morris admitted, however, that Jennings was the only contractor to whom he personally delivered HABC payment checks. Morris dropped off Jennings's checks at his (Jennings's) place of business, while all other contractors picked up their checks at Morris's office. Finally, Morris claimed that he put Elias on the no-bid contractor list at the request of his supervisor.

James Karim, who was a subcontractor for Elias on three VSFP jobs, was another witness for the government. According to Karim, Jennings required him to do extra work that was not covered by the subcontracts and then refused to pay for this work. Karim's partner called Morris at the VSFP office to complain about Jennings's methods of dealing, including his failure to pay for all work completed. When Jennings learned of the call, he told Karim that the calls were of "no use." Jennings said, the "people downtown report right back to[me]. . . . I have that under control. So, your complaints are . . .worthless." As Jennings predicted, Morris took no action on Karim's complaint.

Jennings testified in his own defense. He denied giving any money to Morris.

## II.

■ Jennings argues that district court erred when it denied his motion for a judgment of acquittal under Fed.R.Crim.P. 29. We must sustain his conviction if the evidence, viewed in the light most favorable to the government, was sufficient for a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *See United States v. Brewer,* 1 F.3d 1430, 1437 (4th Cir.1993).

Jennings claims that the statute under which he was convicted, 18 U.S.C. § 666, prohibits "bribes" but not "gratuities." Specifically, Jennings says that the evidence showed that he gave gratuities, not bribes, to Morris because Morris testified that he did no special favors for Jennings and that he (Morris) therefore did not abuse his office. From this, Jennings concludes that the government failed to prove that he violated § 666. We disagree. Regardless of whether § 666 applies to gratuities, there was sufficient evidence to convince a rational juror beyond a reasonable doubt that the payments Jennings made to Morris were bribes.

### A.

Some background on 18 U.S.C. § 666 is useful. We begin with the pertinent language of the statute, which is entitled "Theft or bribery concerning programs receiving Federal funds":

> Whoever . . . *corruptly gives,* offers or agrees to give anything of value to any person, *with intent to influence or reward* an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of any such organization, government, or agency involving anything of value of $5000 or more; shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a)(2) (1988)(emphasis added).

This subsection prohibits payoffs to state and local officials who influence the distribution of federal funds. Before § 666 was enacted in 1984, a circuit split raised doubt as

to whether state and local officials could be considered "public officials" under the general statute, 18 U.S.C. § 201. *See* S.Rep. No. 98–225, at 369(1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510. Congress acted to mend the split without awaiting word on this issue from the Supreme Court.[2] *See id.* at 370, 1984 U.S.C.C.A.N. at 3511. By enacting § 666 Congress supplemented § 201 to make clear that federal law prohibits "significant acts of . . . bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." *Id.* at 369, 1984 U.S.C.C.A.N. at 3510.

Jennings's argument on appeal—that he paid gratuities, not bribes—draws upon the language of § 201. Section 201 prohibits two types of payments to federal officials: (1) bribes and (2) illegal gratuities. *See United States v. Muldoon,* 931 F.2d 282, 287 (4th Cir.1991). Section 201(b), the bribery section, punishes anyone who *"corruptly* gives, offers or promises anything of value to any public official . . . *with intent . . . to influence any official act."* 18 U.S.C. § 201(b)(1)(A)(1988) (emphasis added). Section 201(c), the illegal gratuity section, punishes anyone who "gives, offers, or promises anything of value to any public official . . . *for or because of* any official act performed or to be performed by" a public official. § 201(c)(1)(A) (emphasis added).

▮ Whether a payment is a bribe or an illegal gratuity under § 201 depends on the intent of the payor. A bribe requires that the payment be made or promised "corruptly," that is, with "corrupt intent." Under § 201 "corrupt intent" is the intent to receive a specific benefit in return for the payment. *See Muldoon,* 931 F.2d at 287; *United States v. Duvall,* 846 F.2d 966, 971 n. 6, 972 (5th Cir.1988); *United States v. Irwin,* 354 F.2d 192, 197 (2d Cir.1965). In other words, the payor of a bribe must intend to engage in " 'some more or less specific quid pro quo' " with the official who receives the payment. *Duvall,* 846 F.2d at 972 (quoting *United States v. Arthur,* 544 F.2d 730, 734 (4th Cir.1976)); *accord United States v. Sun–Dia-*

*mond Growers of California,* 138 F.3d 961, 966 (D.C.Cir.1998) (discussing the quid pro quo element of § 201(b) bribery), *cert. granted in part,* —— U.S. ——, 119 S.Ct. 402, —— L.Ed.2d —— (1998) (No. 98–131), *and cert. denied,* —— U.S. ——, 119 S.Ct. 409, —— L.Ed.2d —— (1998) (No. 98–374); *United States v. Johnson,* 621 F.2d 1073, 1076 (10th Cir.1980) (same); *cf. also United States v. Niederberger,* 580 F.2d 63, 68 (3d Cir.1978)(explaining that under § 201 the intent to "corruptly" receive a payment means the intent to effectuate a quid pro quo); *United States v. Strand,* 574 F.2d 993, 995 (9th Cir.1978) (same). Accordingly, a good will gift to an official to foster a favorable business climate, given simply with the " 'generalized hope or expectation of ultimate benefit on the part of the donor,' " does not constitute a bribe. *Johnson,* 621 F.2d at 1076 (quoting *Arthur,* 544 F.2d at 734); *cf. also United States v. Allen,* 10 F.3d 405, 411 (7th Cir.1993) ("Vague expectations of some future benefit should not be sufficient to make a payment a bribe."). An illegal gratuity, on the other hand, is a payment made to an official concerning a specific official act (or omission) that the payor expected to occur in any event. No corrupt intent to influence official behavior is required. The payor simply must make the payment "for or because of" some official act. *See Muldoon,* 931 F.2d at 287; *accord Sun–Diamond Growers,* 138 F.3d at 966(explaining that "in contrast to bribery, [a] gratuity and the [relevant] official act need not motivate each other"); *cf. also United States v. Griffin,* 154 F.3d 762, 764 (8th Cir.1998) ("The core difference between a bribe and a gratuity is . . . the *quid pro quo,* or the agreement to exchange cash for official action."); *United States v. Mariano,* 983 F.2d 1150, 1159 (1st Cir.1993) ("The essential difference between a bribe and an illegal gratuity is the intention of the bribe giver to effect a quid pro quo."). In sum, the line between a payment made "corruptly . . . with intent to influence" an official act and a payment made "for or because of" an official act is the same line that separates a bribe from an illegal gratuity. *Cf. United States v. Kummer,* 89 F.3d 1536, 1540 (11th Cir.1996);

---

2. Shortly after § 666 became law, the Court held in *Dixson v. United States,* 465 U.S. 482, 496, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984), that persons who "occupy a position of public trust with official federal responsibilities," including state and local officials, are "public officials" under 18 U.S.C. § 201.

*United States v. Lopreato,* 83 F.3d 571, 575 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 187, 136 L.Ed.2d 125 (1996).

 Because the distinguishing factor between a bribe and an illegal gratuity is the intent behind the payment, the timing of the payment in relation to the official act for which it is made is (in theory) irrelevant. *Cf. Griffin,* 154 F.3d at 764. Bribes often are paid before the fact, but "it is only logical that in certain situations the bribe will not actually be conveyed until the act is done." *United States v. Campbell,* 684 F.2d 141, 148 (D.C.Cir.1982). By this same logic, illegal gratuities, which typically follow the act for which they are paid, may be conveyed before the occurrence of the act (so long as the payor believes the official has already committed himself to the action). *See id.; Mariano,* 983 F.2d at 1159. This can cause the distinction between bribes and illegal gratuities, which is clear in theory, to look somewhat hazy in real life. *See United States v. Biaggi,* 674 F.Supp. 86, 87–88 (E.D.N.Y.1987) (Weinstein, C.J.), *aff'd,* 853 F.2d 89 (2d Cir. 1988). Without knowing the payor's intent, one cannot know whether the payment was a bribe or an illegal gratuity. Thus, without proof of corrupt intent on the payor's part, a bribery conviction is impossible.

 Direct evidence of intent is unnecessary, however. To prove bribery under § 201, the government is not required to prove an expressed intention (or agreement) to engage in a quid pro quo. Such an intent may be established by circumstantial evidence. *See United States v. Massey,* 89 F.3d 1433, 1439 (11th Cir.1996); *United States v. Biaggi,* 909 F.2d 662, 684 (2d Cir.1990). Also, the government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions). Bribery requires the intent to effect an exchange of money (or gifts) for specific official action (or inaction), but each payment need not be correlated with a specific official act. *See Arthur,* 544 F.2d·at 734. Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action. *See id.* In other words, the intended exchange in bribery can be "this for these" or "these for these," not just "this for that." Further, it is not necessary for the government to prove that the

payor intended to induce the official to perform a set number of official acts in return for the payments. The quid pro quo requirement is satisfied so long as the evidence shows a "course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor." *Id.* (internal quotation omitted). Thus, all that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return. For example, payments may be made with the intent to retain the official's services on an "as needed" basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf. *See id.* This sort of "I'll scratch your back if you scratch mine" arrangement constitutes bribery because the payor made payments with the intent to exchange them for specific official action.

 Although the distinction between bribes and illegal gratuities under § 201 is sometimes difficult to apply, the distinction has real consequences nevertheless. "Payment of an illegal gratuity is a lesser included offense of bribery." *Muldoon,* 931 F.2d at 287. This is because corrupt intent is a "different and higher" degree of criminal intent than that necessary for an illegal gratuity. *United States v. Brewster,* 506 F.2d 62, 72 (D.C.Cir.1974). As a result, the punishment for bribing a public official is much more severe than the punishment for paying an illegal gratuity. *Compare* 18 U.S.C. § 201(b)(bribery is punishable by up to 15 years in prison) *with id.* § 201(c)(illegal gratuity is punishable by up to two years in prison). Thus, it is important that a jury be properly instructed on the difference between a bribe and a gratuity in cases when there is a question about the nature of the payment alleged.

### B.

Jennings argues that § 666 adopts § 201's bribe regime and then stops. He points out that § 666(a)(2) only prohibits payments given"corruptly," just like the general bribery provision, § 201(b), and unlike the illegal gratuity provision, § 201(c). This similarity to § 201(b) (and corresponding dissimilarity to § 201(c)), Jennings claims, shows that § 666 prohibits only bribery. Moreover,

§ 666's punishment provision allows up to ten years in prison, with nothing comparable to § 201(c)'s two-year cap for an illegal gratuity. *See* 18 U.S.C. § 666(a). Thus, Jennings argues that in order to convict him, the government had to prove that he bribed Morris.

As we explain below (in part II.C.), Jennings's conviction must stand because the evidence was sufficient to prove that he intended to influence Morris's official acts by

3. One difference between the language of § 666(a)(2) and § 201(b) is that the former prohibits gifts made with the corrupt intent "to influence or reward" officials while the latter prohibits gifts made with the corrupt intent "to influence" officials. The additional words "or reward" in § 666(a)(2) have no import in Jennings's case, however. At the very least, we read these words to embody the established rule (discussed in part II.A., above) that a bribe can be promised before, but paid after, the official's action on the payor's behalf. This definition accords with the traditional meaning of the term "reward" as something offered to induce another to act favorably on one's behalf (for example, a bounty offered for the capture of a fugitive). *See, e.g., Webster's II: New Riverside University Dictionary* 1007 (2d ed.1988); *Black's Law Dictionary* 1322 (6th ed.1990). Thus, for this case we will assume that the "or reward" language in § 666(a)(2) clarifies that the distinction between a bribe and a gratuity is a matter of intent, not simply a matter of timing (as some courts have suggested, *see, e.g., United States v. Coyne*, 4 F.3d 100, 111(2d Cir.1993)).

Because (as we discuss below) the evidence was sufficient to convict Jennings under the traditional (and somewhat narrow) meaning of "reward," we need not decide whether § 666(a)(2) actually uses the word in a broader sense. Specifically, we need not address the government's argument that the "or reward" language in § 666(a)(2) actually refers to no-strings-attached gifts, that is, payments that would be "illegal gratuities" under § 201(c). And, we likewise need not resolve the puzzle created by the government's argument, namely, why § 666(a)(2)'s language prohibiting "rewards" given "corruptly" should be interpreted to cover gratuities, when under § 201 any payment made "corruptly" is a bribe, not an illegal gratuity. *Compare United States v. Bonito*, 57 F.3d 167, 171 (2d Cir.1995) (saying that § 666 covers gratuities "made with intent to reward past conduct, so long as the intent to reward is corrupt"), *with United States v. Lasanta*, 978 F.2d 1300, 1309 (2d Cir.1992) (explaining that under § 201 a bribery conviction requires proof of corrupt intent while an illegal gratuity conviction does not), *and United States v. Zacher*, 586 F.2d 912, 915 (2d Cir. 1978) (same).

paying him money, that is, Jennings intended to engage in a quid pro quo. Jennings's intent therefore was sufficiently corrupt to call his payments "bribes" (or "rewards"[3]).As a result, we need not decide today whether § 666 also covers "gratuities," that is, payments made for or because of an official act.[4]

## C.

We turn to the evidence in Jennings's case. To begin with, Jennings is

4. The Second Circuit has said that § 666 prohibits payment of both bribes and gratuities. *See Bonito*, 57 F.3d at 171; *see also United States v. Crozier*, 987 F.2d 893, 898–99 (2d Cir.1993) (considering the former version of § 666). The Seventh Circuit has suggested the same by holding that an indictment under § 666(a)(2) need not allege "any specific quid pro quo." *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). These decisions blur the long standing distinction between bribes and illegal gratuities. By allowing § 666(a)(2) convictions to stand without proof that the defendant intended to engage in a quid pro quo, these cases appear to conclude that § 666 abandons the traditional meaning of "corrupt intent" attributed to the statute on which § 666 is based, § 201. A close reading of these cases reveals, however, that there is still room for an argument that § 666 does not prohibit gratuities. This argument is that § 666 accepts the longstanding bribe/gratuity distinction, adopts the traditional meaning of "corrupt intent" in § 201, and criminalizes only bribes.

The Seventh Circuit in *Agostino* did not acknowledge that under § 201 courts equate "corrupt intent" with the intent to engage in a relatively specific quid pro quo. In fact, the court did not mention § 201, so we cannot know whether it considered the customary distinction between bribes and illegal gratuities. *Agostino's* persuasive weight is therefore subject to debate.

The Second Circuit has discussed the relationship between § 201 and § 666, as well as the bribe/gratuity distinction of § 201, in *Crozier. See* 987 F.2d at 898–99. According to that court, a reading of § 666's original and current versions reveals that the section has always prohibited both bribes and gratuities. *See id.* (original version); *Bonito*, 57 F.3d at 171(current version). There is an argument, however, for distinguishing both *Crozier* and *Bonito*.

In *Crozier* the defendant (convicted under a former version of § 666) claimed that his payments were gratuities, not bribes, and that gratuities were not prohibited by § 666. In order to address this claim, the Second Circuit analyzed 18 U.S.C. § 666(c) (Supp. II 1985), the original version of what is now § 666(a)(2). *See* 987 F.2d at 898–900. As first enacted, § 666(c) outlawed payments made "for or because of" the official

acts of certain state or local officials. (Section 666(c) also did not use the word "corruptly.") Thus, § 666 adopted the same language that appears in § 201's gratuity section, § 201(c). The *Crozier* court focused on this "for or because of" language, saying it was what distinguished § 201(c) from that statute's bribery provision, § 201(b). *See id.* at 898–99. The *Crozier* court reasoned that Congress, by using the same "for or because of" language in § 666(c), intended for § 666 (which was enacted to supplement § 201) to prohibit gratuities. *See id.*

In support of his contention that § 666(c) did not prohibit gratuities, the defendant in *Crozier* (who was convicted for conduct that occurred in July 1986) argued that the statute's scope was *broadened* to *include* gratuities by an October 1986 amendment, which replaced the original version of the statute with (essentially) the current version. *See id.* After the 1986 amendment § 666 prohibited (as it still does) payments made "corruptly ... with intent to influence or reward" certain state and local officials. This "corruptly ... with intent to influence or reward" language in § 666(a)(2) replaced the "for or because of" language in the old § 666(c). The *Crozier* defendant argued that the 1986 addition of the "corruptly ... with intent to influence or reward" language expanded the reach of § 666 to cover gratuities. Thus, he contended that his conviction was invalid because the statute prohibited only bribes when his conduct occurred.

The *Crozier* court, after consulting the statutory history of the 1986 amendment to § 666, rejected the defendant's claim that § 666 had been amended to cover gratuities. *See id.* The court noted that this amendment made § 666 "parallel" to 18 U.S.C. § 215 (the bank bribery statute), which itself was amended in 1986. *Id.* The 1986 amendments to §§ 215 and 666, the *Crozier* court said, were intended "to limit the scope of these statutes, and not to broaden them to include new theories." *Id.* (citing H.R.Rep. No. 99–335, at 5–6 (1986), *reprinted in* 1986 U.S.C.C.A.N.1782, 1786–87; H.R.Rep. No. 99–797, at 30 n.9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153 n.9). However, *Crozier* did not specify the nature or degree of the limitation on the two statutes. *See* 987 F.2d at 898–99. Since *Crozier* did not address the scope of the new § 666(a)(2), it did not decide the converse of the question presented by the defendant in that case—whether the 1986 amendment to § 666 *narrowed* the scope of the statute's prohibition to *exclude* gratuities.

The Second Circuit purportedly took up this question in *Bonito.* In *Bonito* the defendant argued exactly the opposite of what the defendant argued in *Crozier.* The *Bonito* defendant claimed that the 1986 amendment to § 666 (which replaced the old "for or because of" language of § 666(c) with the new "corrupt ... with intent to influence or reward" language of § 666(a)(2)) removed gratuities from the scope of § 666's prohibition. *See* 57 F.3d at 171. He argued that § 666 no longer reached gratuities because that section now lacked the "for or because of" language that the *Crozier* court had relied upon in deciding that § 666's language was similar to that of § 201's illegal gratuity

provision. But the *Bonito* court seemed to disagree. The court said that it was "[f]atal to [the defendant's] argument ... that the deleted ['for or because of'] language has been replaced with language that is to the same effect[, 'to influence or reward']". *Id.* Here the court apparently meant that the new § 666(a)(2), like the old § 666(c), prohibits both bribes and gratuities.

However, a closer analysis of *Bonito* suggests that its holding was the same as ours today: that regardless of whether § 666(a)(2) reaches gratuities, the statute reached the defendant's conduct because the defendant paid bribes. First, although the *Bonito* court may have meant to say (in the statement we just quoted) that gratuities are prohibited by the new § 666, it may have meant something else. Immediately after the court made the statement quoted above, it also said that "the current statute continues to cover payments made with intent to reward past official conduct, so long as the intent to reward is corrupt." *Id.* The court then said (in upholding the trial court's jury charge) that § 666(a)(2) requires that "the corrupt agreement, offer or payment must precede the official act to be influenced or rewarded." *Id.* These latter two statements describe bribes, not gratuities, as those words are traditionally defined (for § 201 purposes). *See* part II.A., above. It is therefore possible that the *Bonito* court did not mean to hold that § 666(a)(2) prohibits gratuities. Second, the *Bonito* court's sufficiency of the evidence holding shows that the payments at issue in that case were, quite clearly, bribes. *See id.* at 174–75 (holding that "there was enough evidence to allow the jury to find that the [defendant and the official] had *corruptly agreed* that [the defendant] would give the car [to the official as a] *bribe in exchange for* favors [from the official]"; *see also id.* (again referring to the defendant's gift as a "bribe"). As a result, it is clear that, whatever the *Bonito* court meant to say about whether § 666 prohibits gratuities, its discussion of gratuities was unnecessary to the disposition of the case.

In any event, a court squarely addressing the issue could reasonably conclude that § 666(a)(2) prohibits bribes, but not gratuities, for two reasons. First, *Bonito* does not offer the only plausible comparison of the language of §§ 666 and 201. Instead of deciding that § 666(a)(2) resembles § 201's illegal gratuity provision, § 201(c), a court might conclude that § 666(a)(2) actually resembles § 201's bribery provision, § 201(b). Under this view the "corruptly ... with intent to influence or reward" language of § 666(a)(2) has the same effect as the "corruptly ... with intent to influence" language of § 201(b) and not the same effect as the "for or because of" language of § 201(c). If this is true, then § 666(a)(2) prohibits only bribes.

Second, a court interpreting the statutory history of the 1986 amendment to § 666 could reach the conclusion (unstated in, but consistent with, *Crozier*) that the 1986 amendment to § 666 clarified that the statute prohibits only bribes. As *Crozier* recognized, Congress intended for § 666 (as amended in 1986) to parallel § 215 (as amended the same year). *See Crozier,* 987 F.2d

mistaken to focus on Morris's testimony that he believed he accepted gifts, not bribes, from Jennings. Under § 666(a)(2) the intent of the payor, not the intent of the payee, is determinative of whether a crime occurred. *See Mariano*, 983 F.2d at 1159 ("The common thread that runs through [18 U.S.C. §§ 666(a)(2) and 201(b) ] is the intent of the payer, by the greasing of palms, to affect the future actions of a public official."); *see also Campbell*, 684 F.2d at 148 n. 11("the donor may be convicted of giving a bribe even despite the fact that the recipient had no intention of altering his official activities" (internal quotation omitted)). Thus, the only intent at issue was Jennings's: if he gave money to Morris with the requisite corrupt intent, Jennings violated the statute regardless of Morris's intent in accepting the money. Of course, Morris's testimony regarding his own intent in taking the payments might have some relevance to Jennings's intent in making them. Morris's testimony is not dispositive of Jennings's intent, however. So long as the other evidence was sufficient to prove beyond a reasonable doubt that Jennings paid Morris with the corrupt intent to influence or reward him, the jury could find Jennings guilty of bribery despite Morris's testimony. We are satisfied that the evidence was more than sufficient to convict Jennings of bribery.

As administrator of the VSFP program at HABC, Morris was in a position to award no-bid contracts to companies doing housing rehabilitation. Jennings's company, Elias, got on the no-bid list after Jennings and his son, Jennings Jr., met with Morris at a Baltimore restaurant. Jennings Jr. was a member of the Board of Commissioners that oversaw HABC activities, and it would be fair to infer that his father brought him to the meeting in order to influence Morris to put Elias on the VSFP list. Not only did Morris place Elias on the list after this meeting, Morris also began awarding contracts to the company.

An uncharged payment of $200 from Jennings to Morris got the ball rolling. In the context of all that happened in this case, it would be reasonable for a juror to find that Jennings made the first payment as well as the succeeding ones with the intent to signal Morris that more payments were in the cards if more contracts came Elias's way. A reasonable juror could have found that Jennings intended the three charged payments to be either arranged-in-advance rewards in return for Morris's official acts on behalf of Jennings's companies or paid-in-advance bribes for Morris's future acts on behalf of the companies, or both.

However, because the evidence was sufficient to prove that Jennings committed bribery, we need not decide whether § 666 prohibits gratuities. We therefore leave the definitive interpretation of § 666's language and statutory history for another day.

On the same day Jennings made the first charged payment of $2,500–$3,000 to Morris, Elias deposited an HABC check for over $75,000. Over the next several days, Morris approved several new jobs for Elias, sometimes raising the in-house estimates so that

at 899; *see also* H.R. Rep. 99–797, at 30 n.9, 1986 U.S.C.C.A.N. at 6153 n.9 (explaining that, as amended, § 666 "parallels the bank bribery provision (18 U.S.C. § 215)"). As *Crozier* also acknowledged, Congress intended its 1986 change to § 215 to *narrow* that statute. *Crozier*, 987 F.2d at 899; H.R.Rep. No. 99–335, at 3–7, 1986 U.S.C.C.A.N. at 1784–1788. However, *Crozier* did not discuss how the 1986 amendment to § 215 narrowed that provision. Before the amendment § 215(b) reached any payment "for or in connection with any transaction of business." 18 U.S.C. § 215(b) (Supp. II 1985). As a result of the amendment the section now reaches only payments made "corruptly... with intent to influence or reward." 18 U.S.C. § 215(a)(1) (1988). According to the House Report, the intended effect of this amendment to § 215 was to narrow the statute to cover only payments made or received "corruptly," that is, "bribes or rewards" instead of inconsequential gifts. *See* H.R. Rep. 99–335, at 5, 6 nn. 24 & 25, 1986 U.S.C.C.A.N. at 1786, 1787 nn. 24 & 25. The Report has an arguable implication for § 666 that *Crozier* did not mention: that Congress changed § 666, by adding the "corruptly ... with intent to influence or reward" language, to clarify that § 666 (like § 215) prohibits *only* bribes. *See also* George D. Brown, *Stealth Statute—Corruption, the Spending Power, and the Rise of 18 U.S.C. § 666*, 73 Notre Dame L.Rev. 247, 308–310 (1998)(criticizing *Crozier* and arguing that because § 666 requires "corrupt intent," the section prohibits only bribes).

However, because the evidence was sufficient to prove that Jennings committed bribery, we need not decide whether § 666 prohibits gratuities. We therefore leave the definitive interpretation of § 666's language and statutory history for another day.

Elias would be paid at the higher rate it proposed.

Jennings made the second charged payment of $2,500 to Morris the day after Elias deposited a $46,000 check from HABC. Shortly there-after, Morris approved more new jobs for Elias, again bumping up some of the in-house estimates.

Jennings made the last charged payment of $1,500 the same day Morris approved eight new projects for Elias, the same day Elias deposited another HABC check, and the same day HABC issued a lead testing contract to EPC, Jennings's other company.

The timing of each charged payment from Jennings to Morris closely corresponded to a payment from HABC to Elias and to Morris's approval of new jobs for Jennings's companies. Moreover, each time Jennings made a cash payment to Morris, he thanked Morris for his help and told Morris that he (Jennings) could not have made it without him. Finally, Jennings used an underhanded method to generate much of the cash for his payments to Morris: Jennings cashed two checks written to his subcontractors at a check cashing establishment whose proprietor forged the endorsements.

On this evidence we believe a reasonable juror could have found that Jennings's payments to Morris were bribes, that is, gifts made with the corrupt intent to induce Morris to engage in, or to reward him for engaging in, official actions on behalf of Jennings's companies. In traditional terms, Jennings paid Morris with the intent of having a quid pro quo arrangement with him.

Even if the evidence did not necessarily link each of Jennings's payments to a specific official act by Morris, a reasonable juror could still conclude that Jennings paid bribes. Over a fairly short period Morris approved over $650,000 worth of contracts for Jennings's companies, and Jennings paid Morris over $7,000 in cash. Again, a reasonable juror could have concluded that there was a course of conduct involving payments flowing from Jennings to Morris in exchange for a pattern of official actions favorable to Jennings's companies, and that was sufficient to convict Jennings of bribery. *See Arthur,* 544 F.2d at 734. Accordingly, the district court did not err when it denied Jennings's motion for an acquittal.

## III.

■ Jennings's second argument is that the district court erred (1) by failing to instruct the jury about the difference between a bribe and a gratuity and (2) by misdefining for the jury § 666(a)(2)'s "corrupt intent" element, thereby omitting the requirement of intent to engage in a quid pro quo. Jennings's trial counsel did not object to the district court's jury instruction on either of these grounds, so our review is for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). For us "to notice an error not preserved by a timely objection, [Jennings] must show that an error occurred, that the error was plain, and that the error affected his substantial rights."*United States v. Hastings,* 134 F.3d 235, 239 (4th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 1852, 140 L.Ed.2d 1100 (1998). Even if Jennings satisfies these requirements, we will exercise our discretion to correct the error only if failure to do so would result in a miscarriage of justice. *See id.*

## A.

As we said in part II.B., we have left open the question of whether § 666 prohibits gratuities because the evidence was sufficient to convict Jennings of bribery. Because we have reserved the gratuity question, a fair review of the now-challenged jury instruction for plain error requires us to assume (without deciding) that § 666 does not prohibit gratuities. This leads us back to § 201.

■ When instructing the jury on § 201(b), a trial court must explain that a payment is made with "corrupt intent" only if it was made or promised with the intent to corrupt the particular official. Not every payment made to influence or reward an official is intended to corrupt him. *See United States v. Arthur,* 544 F.2d 730, 734, 735(4th Cir.1976). One has the intent to corrupt an official only if he makes a payment or promise with the intent to engage in

a fairly specific quid pro quo with that official. Of course, a court need not resort to Latin to make this point. It simply may explain that the defendant must have intended for the official to engage in some specific act (or omission) or course of action (or inaction) in return for the charged payment.

 Even if a court does not properly define "corrupt intent," it can adequately convey that concept to the jury by describing the exact quid pro quo that the defendant is charged with intending to accomplish. For example, a court may inform the jury that it may find the defendant guilty only if it determines "that *(defendant's name)* gave *(the charged payment)* corruptly, that is, with the intent to induce *(official's name)* to commit *(the specific official act or omission that defendant is charged with intending to induce).*" *See, e.g.,* Committee on Model Criminal Jury Instructions Within the Eighth Circuit, *Manual of Model Jury Instructions for the District Courts of the Eighth Circuit,* § 6.18.201A (1996) (instruction for § 201(b)(1)). Such an instruction can satisfactorily convey to the jury the concept of quid pro quo (even absent a proper definition of "corrupt intent")if it requires the jury to find that the defendant made or promised a specific payment in exchange for a specific official act or omission. Even so, this type of instruction is best used to amplify, rather than define, the concept of quid pro quo.

 Additionally, when there is some evidence to suggest that the defendant's payment was a gratuity as defined in § 201(c), the trial court must at the defendant's request instruct the jury on the lesser-included offense of "illegal gratuity." *See United States v. Head,* 641 F.2d 174, 180 (4th Cir. 1981); *Arthur,* 544 F.2d at 735(citing *United States v. Brewster,* 506 F.2d 62, 83 (D.C.Cir. 1974)); *United States v. Chen,* 754 F.2d 817, 825 (9th Cir.1985). In such cases the court must set forth the elements of the illegal gratuity offense. *See United States v. Muldoon,* 931 F.2d 282, 288 (4th Cir.1991); *see also United States v. McLamb,* 985 F.2d 1284, 1293 (4th Cir.1993) (failure to instruct the jury on any essential element of an offense constitutes plain error). The court also must explain that an illegal gratuity differs from a bribe in that the gratuity is paid *without* corrupt intent.

 On our assumption that § 666 makes the same bribe/gratuity distinction as § 201, a court instructing a jury on § 666(a)(2) must define the "corrupt intent" element in the same way as it would if instructing on § 201(b). Thus (we assume) a court must instruct the jury that it may convict a defendant for violating § 666(a)(2) only if it finds that the defendant intended to exchange a payment for some specific official act or course of action. Further, because a court instructing on § 201(b) must explain the lesser-included offense of illegal gratuity whenever there is some evidence supporting a gratuity theory, it follows (under our assumption) that a court instructing on § 666(a)(2) must explain, if requested, the defense of "mere gratuity" when there is evidence to support a gratuity theory. *See United States v. Hicks,* 748 F.2d 854, 857 (4th Cir.1984) ("[I]t is settled law in this circuit... that, at least upon proper request, a defendant is entitled to an instruction submitting to the jury any theory of defense for which there is a foundation in the evidence.").

 The district court gave the following instruction to the jury on the intent required for a § 666(a)(2) violation:

> In order to establish [Jennings's] guilt ... the government must prove ... that [he] gave a thing of value to [Morris] ....
>
> · · · · ·
>
> ... [and] that [Jennings] did so corruptly, that is, with the intent to influence or reward [Morris] in connection with [HABC] business....
>
> So, in order to find [Jennings] guilty ... you must find beyond a reasonable doubt that ... [Jennings] corruptly gave to [Morris] a bribe ..., [and] that ... [Jennings] had the intent of influencing or rewarding [Morris] corruptly in connection with HABC contracts obtained and performed by Elias....
>
> If you do find that [Jennings] gave the reward or thing of value, then the government must prove that [Jennings] did so with a corrupt intent to influence or reward [Morris]. An act is done with a corrupt intent if it is performed voluntarily and intentionally—that means willfully, not as a mistake or accident—and with the purpose, at least in part, of either accom-

plishing an unlawful end or result or accomplishing some otherwise lawful end or result by an unlawful manner or means.

In other words, in order to prove [Jennings] guilty, the government must prove to you ... that he acted with corrupt intent, that is, that he gave [Morris] money with the purpose of influencing or rewarding him with respect to HABC business or transactions.

The phrase to influence means that a payment was made before the official action. The phrase to reward means that a payment was made afterwards. Payments made to influence official action and to reward official action are both prohibited.... Payments made, however, without corrupt intent are not criminal acts.

Now, if you find the government has not proved beyond a reasonable doubt that [Jennings] gave money to [Morris] with corrupt intent to influence or reward him with respect to HABC business or transactions, then you must find [Jennings] not guilty.

### 1.

Jennings argues that the district court erred because it did not instruct the jury on the difference between a bribe and a gratuity. Jennings did not request such an instruction or object to its omission. Omitting an explanation of the bribe/gratuity distinction was not error, much less plain error, in this case. Jennings did not defend the case on a gratuity theory. Rather, he disclaimed that theory by claiming that he paid Morris nothing at all. And, although Morris testified that he considered the payments to be gifts, Jennings urged the jury to reject Morris's testimony. A gratuity instruction therefore would have been inconsistent with Jennings's defense. In these circumstances, the district court did not err in failing to inject a gratuity defense into the trial by offering an unrequested instruction on the subject. *Cf. United States v. Matzkin,* 14 F.3d 1014, 1018

(4th Cir.1994). As a result, it was appropriate for the district court to instruct the jury that it could find Jennings guilty of bribery or nothing (so long as the bribery instruction was correct).

### 2.

■ Jennings next argues that the district court plainly erred by giving a wrong instruction on the "corrupt intent" element of bribery—an instruction that left out the requirement of intent to engage in a quid pro quo. We agree.

A first glance at the instruction reveals that the court correctly explained the meaning of the "to influence or reward" language in § 666(a)(2). As noted in part II.B., we assume that these words take their common meaning under § 666: payments made to "influence" an official are made before the official's act (or omission), while payments made to "reward" an official are made after the act. Thus, § 666(a)(2) prohibits all bribes, regardless of whether they were made before or after the official act.

■ Yet the court's accurate explanation of the terms "influence" and "reward" did nothing to ensure that the jury found that Jennings's payments were, indeed, bribes. This is because the court incorrectly defined the "corrupt intent" element of bribery, which is the intent to engage in a relatively specific quid pro quo. A correct description of this element is essential because the gravamen of a bribery offense is a payment made to *corruptly* influence or reward an official act (or omission). As a result, to explain properly the quid pro quo element of § 666(a)(2), a correct definition of "corruptly" must modify the "to influence or reward" language in the court's instruction. Without an appropriate definition of "corruptly," an instruction mistakenly suggests that § 666 prohibits *any* payment made with a generalized desire to influence or reward (such as a goodwill gift), no matter how indefinite or uncertain the payor's hope of future benefit.[5]

---

5. As we said in part II.A., goodwill gifts are given with no more than "some generalized hope or expectation of ultimate benefit on the part of the donor." *Arthur,* 544 F.2d at 734. Clearly, goodwill gifts are neither bribes nor gratuities, since they are made *neither* with the intent to engage in a "relatively specific quid pro quo" with an

official nor "for or because of" a specific official act (or omission). *See United States v. Johnson,* 621 F.2d 1073, 1076 (10th Cir.1980) (explaining that § 201's bribery provision does not cover gifts made with merely a " 'generalized hope or expectation of ultimate benefit on the part of the donor' " (quoting *Arthur,* 544 F.2d at 734));

In sum, unless the district court defined "corrupt intent" to include the quid pro quo requirement, it gave an erroneous instruction on an essential element of bribery.

In defining "corrupt intent" the trial court told the jury that "[a]n act is done with a corrupt intent if it is performed voluntarily and intentionally ... and with the purpose ... of either accomplishing an unlawful end or result or accomplishing some otherwise lawful end or result by an unlawful manner or means."[6] This was error. The definition fails to explain that "corrupt intent" is the intent to induce a specific act. Therefore, the district court's instruction on § 666(a)(2) left out the quid pro quo requirement.

Standing alone, this instruction was plainly erroneous.

Reading the district court's jury instruction as a whole cannot save it either. In an attempt to clarify the meaning of "corruptly," the court attempted to elaborate on that term four times. First, the court told the jury that Jennings was guilty only if he made the payments "corruptly, that is, with the intent to influence or reward [Morris] in connection with the [HABC] business." Second, the court reiterated that the jury could convict on each count only if it decided that the charged payment was made with "the intent of influencing or rewarding [Morris] corruptly in connection with HABC con-

---

*United States v. Sun–Diamond Growers of California*, 138 F.3d 961, 967 (D.C.Cir.1998) (explaining that § 201's gratuity provision does not cover gifts given to an official with "some vague hope of inducing warm feelings" or "generalized sympathy" toward the donor), *cert. granted in part*, —— U.S. ——, 119 S.Ct. 402, —— L.Ed.2d —— (1998) (No. 98–131) *and cert. denied*, —— U.S. ——, 119 S.Ct. 409, —— L.Ed.2d —— (1998) (No. 98–374). Thus, regardless of whether § 666(a)(2) prohibits gratuities, it does not reach mere goodwill gifts.

**6.** The district court's definition of "corrupt intent" appears to be an incomplete version of the definition from the respected treatise, Edward J. Devitt, et al., 3 *Federal Jury Practice and Instructions*, § 25.09 (1990)(pattern instructions for 18 U.S.C. § 201; "Corruptly Defined"). The treatise's definition also was quoted in the legislative history of the 1986 amendment to 18 U.S.C. § 215 (discussed in part II.B.). *See* H.R. Rep. No. 99–335, at 6 nn. 24 & 25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1782, 1787 nn. 24 & 25 (citing the 1977 version of the Devitt treatise). However, the district court's definition was not entirely consistent with the treatise's definition. The court left out the second sentence: "The motive to act 'corruptly' is ordinarily a hope or expectation of either financial gain or other benefit to one's self, or some aid or profit to another." *See id.;* Devitt, et al., *supra*, § 25.09. Without this sentence the definition does not even allude to the concept of quid pro quo. Therefore, even if § 666 adopts this definition of corrupt intent, the district court's definition of that term was incomplete.

However, we believe that our court in *Arthur* set forth a better definition of corrupt intent than the one in the Devitt treatise. As explained in part II.A. above, *Arthur* defined "corrupt intent" as the intent to engage in "some more or less specific quid pro quo." *Arthur*, 544 F.2d at 734. Also, we question the Devitt treatise's support for its definition of "corrupt intent." The treatise attributes the definition to *United States v.*

*Strand*, 574 F.2d 993, 996 (9th Cir.1978). *See* Devitt, et al., *supra*, § 25.09 (Notes). However, the *Strand* court did not adopt the definition of "corruptly" that Devitt attributes to it.

In *Strand* the Ninth Circuit quoted the trial court's definition of "corruptly," which was later adopted by the Devitt treatise. *Id.* at 995–96. The appeals court also quoted parts of the trial court's jury instruction on the elements of the offense of bribery. *See id.* at 995(stating that the defendant must have accepted money *"in return for* being induced to ...*violat[e]* ... *his official duties"* (emphasis added)). The *Strand* court then held that "[t]he trial court's instructions, *taken as a whole*, correctly and clearly charged the jury that ... the requisite corrupt intent consisted of the defendant's ... acceptance of money for *financial gain, in return for* a *violation of his official duty*, with the *specific intent* to violate the law." *Id.* (first and fourth emphases added). Here, the Ninth Circuit was alluding to the "financial gain" and "specific intent" language in the trial court's definition of "corruptly." But the appeals court also was referring to the trial court's discussion of the "in return for ... violation of his official duty" element of the offense. *See id.* Thus, the Ninth Circuit in *Strand* did not hold that the trial court's definition of "corruptly" was sufficient in itself to convey to the jury the proper intent element for bribery. Rather, the appeals court held that the trial court's instructions, "taken as a whole," adequately conveyed the proper intent requirement to the jury. Therefore, *Strand* merely stands for the proposition that a jury instruction may be sufficient *on the whole* when it allows the jury to convict only if it finds that the defendant gave (or received) money "in return for" a violation of some official duty. In fact, it is possible to read *Strand* as adopting the *Arthur* definition of corrupt intent. *Cf. id.* at 995 (explaining that the crucial difference between a bribe and a gratuity under § 201 is that bribery requires the intent to engage in a "quid pro quo").

tracts." Third, the court explained that the government had to prove that Jennings gave Morris money "with the purpose of influencing or rewarding him with respect to HABC business or transactions." Fourth, the court summed up by advising the jury that it had to acquit Jennings if the government did not prove that Jennings gave money to Morris "with corrupt intent to influence or reward him with respect to HABC business or transactions."

If any of the court's four explanations of "corrupt intent" required the jury to find a relatively specific quid pro quo, the jury instruction would have been saved (despite the court's failure to include in it score definition of "corruptly" the quid pro quo element of bribery). This is because requiring the jury to find that Jennings intended to trade specific payments for specific favors from Morris would have notified the jury of the quid pro quo element of the § 666(a)(2) offense. But none of the court's elaborations on the meaning of "corruptly" stated that Jennings must have given money to Morris in exchange for some specific official act or course of action (for example, approving Elias's proposals for nearly the amount requested). Rather, the court repeatedly charged that it was sufficient if Jennings paid Morris to influence him (Morris) "in connection with" or "in reference to" HABC business. These allusions to HABC business were too general because they did not describe any official acts that Jennings intended to induce with his payments to Morris. These explanations could have described a situation in which Jennings paid Morris with a "[v]ague expectation[ ] of some future benefit," *Allen*, 10 F.3d at 411. As a result, the court's attempt to restate the meaning of corrupt intent did not necessarily require the jury to find that Jennings had the intent to engage in a quid pro quo. Therefore, the jury instruction on § 666(a)(2) was plainly erroneous.[7]

### B.

■ Because the district court's plainly erroneous instruction misdefined bribery's "corrupt intent" element by omitting the basic quid pro quo requirement, we will assume that the instruction affected Jennings's substantial rights. Yet we will not exercise our discretion to correct the plain error if it did not "result in a miscarriage of justice, such as when ... the error seriously affects the fairness, integrity or public reputation of [the] judicial proceedings." *Hastings*, 134 F.3d at 244 (internal quotation marks and alteration omitted). " 'Central to this inquiry is a determination of whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt.' " *Id.* (quoting *United States v. Cedelle*, 89 F.3d 181, 186 (4th Cir.1996)).

■ We conclude that there was a fair and reliable determination of Jennings's guilt. Jennings did not claim at trial that he paid gratuities to Morris. Jennings took the stand and testified that he did not pay Morris a dime, and Jennings's lawyer pressed this point at length in his closing. The jury completely rejected Jennings's testimony. We are convinced that a quid pro quo instruction would not have changed the jury's assessment of Jennings's story or its determination of his guilt.

Although Jennings now argues that at most he paid gratuities to Morris, he can only point to two snippets of Morris's testimony to support his argument. First, Morris testified that he never did any special favors for Jennings's companies. Yet Morris admitted to the dubious practice of personally delivering Elias's checks for VSFP work to Jennings's office, something Morris did not do for any other contractor. Second, Morris testified that he considered the payments from Jennings to be gifts. This seems to be a self-serving assumption on Morris's part. Regardless, it is Jennings's intent, not Morris's, that is dispositive.

Here the evidence relevant to Jennings's intent "points inexorably to the conclusion," *Hastings*, 134 F.3d at 244, that he meant to

---

7. Again, this conclusion is premised on our assumption that § 666 only outlaws bribes. We do not decide whether the instruction was proper if § 666 prohibits gratuities. However, if § 666 *does* cover gratuities, we can say with certainty that § 666 must use the word "corruptly" to mean something totally different than does § 201 (which uses the term to distinguish between bribes and gratuities).

bribe Morris, that is, he (Jennings) intended to engage in a quid pro quo with Morris. Jennings was not just tipping Morris, without corrupt intent, for official action that Jennings expected to occur anyway. Morris had the power to decide whether (and for what dollar amount) rehabilitation and lead testing contracts flowed to Jennings's companies. Morris repeatedly awarded such contracts while taking large cash payments from Jennings. Each time Jennings paid Morris, Jennings thanked Morris for his help and told him (in so many words)that his help was essential. This pattern of behavior confirmed the existence of a quid pro quo: there was a course of conduct involving payments from Jennings to Morris "in exchange for a pattern of official actions favorable to [Jennings's companies]." *Arthur*, 544 F.2d at 734. It is simply implausible that Jennings continued to pay Morris with no intent to induce him to continue awarding contracts at favorable prices. Finally, when Jennings learned that one of his subcontractors had registered a serious complaint about Jennings to Morris, Jennings boasted of his influence with Morris, telling the subcontractor that his complaints were futile. This evidence helps to confirm that Jennings's intent all along was to induce Morris to misuse his position, a classic sign of bribery. Jennings' conviction was not a miscarriage of justice, and we will not exercise our discretion to set it aside.[8] The conviction is

*AFFIRMED.*

---

8. Jennings also argues that the district court abused its discretion by admitting evidence that Jennings Jr. was on HABC's governing board and evidence about Jennings Jr.'s involvement with his father's company, Elias. We have considered this point and find no merit in it.